**GOVERNMENT GUARANTEE FUND OF THE REPUBLIC OF FINLAND, SAASTOPANKKIEN KESKUS-OSAKE-PANKKI (SKOPBANK), 35 ACRES ASSOCIATES, 12 ACRES ASSOCIATES and BENEFORI OY, Plaintiffs**

**v.**

**HYATT CORPORATION, Defendant**

Civ. No. 1995-49(M)

District Court for the Virgin Islands

Div. of St. Thomas and St. John

May 4, 1998

Warren B. Cole, Esq., and Richard Hunter, Esq., (Hunter, Colianni, Cole & Turner), Michael M. Baylson, Esq., (Duane, Morris & Heckscher), and Samuel H. Hall, Jr., Esq., (Birch, De Jongh, Hindels & Hall), *for Plaintiffs*

John Zebedee, Esq., (Hymes & Zebedee), R. Eric Moore, Esq., St. Croix, U.S.V.I., John A. Sopuch, III, Esq., (Sopuch, Nouhan & Higgins), and Claude D. Montgomery, Esq., (Philips, Lytle, Hitchcock, Blaine & Huber), *for Defendant*

MOORE, *Chief Judge*

431

## MEMORANDUM

## INTRODUCTION

This matter is before the Court on renewed motion of plaintiffs, Government Guarantee Fund of The Republic of Finland, Saastopankkien Keskus-osake-pankki (Skopbank), 35 Acres Associates, 12 Acres Associates and Benefori Oy ["Skopbank Parties"], specifically 35 Acres Associates ["35 Acres"], the owner of the hotel during the illegal holdover period, for an equitable accounting.[1] This renewed request arose out of a motion for sanctions based primarily on the failure of the defendant, Hyatt Corporation ["Hyatt"], to comply with a previous Order of this Court. The most recent form of this request is included with plaintiffs' report to the Court on Hyatt's noncompliance as a motion for a preclusionary order and other relief filed December 23, 1997.[2] On January 15, 1998, this Court held an evidentiary hearing ["January 1998 Hearing"]. Also before the Court is 35 Acres' motion for summary judgment on Count VI of its Third Amended Complaint.

### Background

Hyatt managed a resort on the island of St. John, U.S. Virgin Islands ["the hotel"] from March of 1990 until removed from the hotel pursuant to this Court's order in September of 1996. By the end of 1988, Skopbank, a Finnish banking corporation, had loaned over 100 million dollars to the former owner, Great Cruz Bay Development Co. ["Great Cruz"], to develop the hotel. After Great Cruz consistently had difficulty keeping up with the mortgage payments to Skopbank, Skopbank agreed in 1990 to lend an additional $ 10.5 million to Great Cruz, but insisted that someone else manage the hotel. As a result, a series of agreements were

---

[1] Count XII of the Third Amended Complaint seeks, *inter alia*, an accounting for all plaintiffs, presumably for the entire period from pre-1990 to present. Insomuch as this Memorandum and Order deals with 35 Acres claim for the period of illegal holdover, this Memorandum and Order deals with that aspect of Count XII as well.

[2] The Skopbank Parties have since filed a further motion entitled Motion for Order to Show Cause Why Hyatt Should Not Be Held in Contempt and Why the Court Should Not Enter Default Judgment, Further Sanctions and Other Relief for Failure to Obey Court Orders dated March 30, 1998. To the extent they are not resolved here, the issues raised in this most recent sanctions motion will be dealt with later.

signed in March of 1990 ["March 1990 Agreements"], primarily between Hyatt and Great Cruz, with Skopbank in the background on all and signatory to some. Under the March 1990 Agreements, Hyatt had the right to manage the operation of the hotel for thirty years, for which it would pay itself a base fee of 1.4 percent of gross revenue plus an incentive fee structured on positive cash flow. Hyatt agreed to pay Skopbank any sums due to Great Cruz as owner. Skopbank agreed to recognize Hyatt as the manager of the hotel in the event Skopbank [*4] foreclosed its mortgage with Great Cruz, but only so long as Hyatt was not in default of its obligations under the March 1990 Agreements.

When Great Cruz continued in default despite Hyatt's management, Skopbank foreclosed on its mortgage with Great Cruz and forced the hotel to judicial sale on March 20, 1995. The hotel was purchased by 35 Acres, a Virgin Islands general partnership of two Finnish corporations wholly owned by Skopbank. 35 Acres terminated the agreements with Hyatt on the next day and ordered it to leave the hotel premises. This suit was filed seeking a declaratory judgment that Hyatt breached the March 1990 Agreements and alleging various claims in tort and contract. Hyatt counterclaimed, among other things, that the plaintiffs had breached their obligations under the March 1990 Agreements and owed Hyatt millions of dollars in damages.[3]

On May 3, 1996, this Court summarily judged that the March 1990 Agreements created an agency relationship with Hyatt which had been terminated as a matter of law and that Hyatt must vacate the hotel and turn over possession to 35 Acres. *Government Guarantee Fund ["GGF"] v. Hyatt Corp.*, 34 V.I. 257, 166 F.R.D. 321 (D.C.V.I.), *aff'd*, 35 V.I. 483, 95 F.3d 291 (3d Cir. 1996). Hyatt, contending that it held an irrevocable agency, refused to leave the hotel pending its appeal to the United States Court of Appeals for the Third Circuit. Hyatt only vacated the hotel premises in September of 1996 after the Court of Appeals affirmed this Court in all respects. *GGF v. Hyatt*, 95 F.3d 291.

---

[3] On April 25, 1995, Hyatt had filed suit against 35 Acres (Civil No. 1995-68), which was dismissed in January of 1996 without prejudice to being refiled as a counterclaim in this case (Civil No. 1995-49). *Hyatt Corp. v. 35 Acres Assocs.*, 1996 U.S. Dist. LEXIS 21722, Civ. Nos. 1995-49, 1995-68, 1996 WL 165008 (D.C.V.I. Jan. 8, 1996).

■ Despite losing at the trial level on the issue of its right to continue as manager of the hotel, Hyatt did nothing to modify its financial accounting procedures to make sure it would be able to make a full accounting to the Court and plaintiffs of its management and funds received — on the off chance that the Court of Appeals might uphold this Court. Hyatt thus ran the risk of not being able to satisfy one of the ordinary principles of agency, namely, that a breaching fiduciary must be able to establish [*6] "that he paid to the principal or otherwise properly disposed of the money or other thing which he is proved to have received for the principal." RESTATEMENT (SECOND) OF AGENCY § 399 cmt. e (1957).

■ On January 28, 1997, this Court ruled on the Skopbank Parties' motion for partial summary judgment on the count of their first amended complaint requesting an equitable accounting (Count XVIII).[4] The Court first reminded the parties that an equitable accounting "is a remedy of restitution where a fiduciary defendant is forced to 'disgorge gains received from the improper use of the plaintiff's property or entitlements.'" Plaintiff makes a "prima facie case by showing [1] a breach of [2] fiduciary duty plus [3] gross receipts resulting to the fiduciary, and the defendant must prove what deductions are appropriate to figure the net profit." *GGF v. Hyatt Corp.*, 35 V.I. 356, 955 F. Supp. 441, 466 (D.C.V.I. 1997) (citations omitted).

The Court found that the Skopbank Parties had established two of the three elements necessary for an equitable accounting, namely: (1) Hyatt acted as a fiduciary during the period of its illegal possession from March 21, 1995 to September 16, 1996, and (2) Hyatt breached that fiduciary duty and wrongfully benefitted by its wilful refusal to vacate the hotel after the Court found its agency had been lawfully terminated. Although an equitable accounting was not then available because the Skopbank Parties did not have the records to establish the dollar amount of gross

---

[4] The Court also dismissed most of the counts of Hyatt's counterclaim. *GGF v. Hyatt Corp.*, 35 V.I. 356, 955 F. Supp. 441 (D.C.V.I. 1997) [erroneously identified by Westlaw as an opinion of the Territorial Court "(Terr. V.I.)"]. The remaining counts of Hyatt's counterclaim were dismissed and Hyatt's Second Amended Counterclaim was rejected by this Court in April of 1997. *GGF v. Hyatt Corp.*, 36 V.I. 295, 960 F. Supp. 931 (D.C.V.I. 1997).

receipts Hyatt received during its illegal possession of the hotel, the Court ruled that Hyatt should bear the burden of establishing the gross receipts received during the eighteen-month illegal holdover and establishing how Hyatt distributed all the funds which came into the hotel under its management during this period.

The Court's Order of January 28, 1997, therefore directed Hyatt to prepare

> a "document," whether in paper or electronic form, from the financial data acquired by Hyatt during its period of wrongful possession after the lawful termination. This "document" would account for all funds received by Hyatt while wrongfully holding over, how these funds were handled and disbursed, and whether Hyatt should be required to disgorge gains received from the improper use of the Skopbank Parties' property or entitlements.

> Hyatt [shall] prepare and produce such a "document" *accounting for all the benefits it received* while wrongfully in possession of the hotel, after March of 1995, including the management fee, chain allocation expenses, etc. . . . . .

955 F. Supp. 441 at 467 (emphasis added).

One week later, on February 5, 1997, the Court held a hearing by telephone to discuss some specific interrogatories posed by the Skopbank Parties. In reference to these requests, the Court stated that

> what I understand the parties or Skopbank to be asking for now is payments made to Hyatt and its related entities from April 1, 1990, to when Hyatt left in 1996. And the portion is already covered by my order, so I will order that be done.

(Feb. 5, 1997, Hearing, Tr. at 44.) This oral order only extended the scope of the accounting document the Court had already ordered to include an accounting for all receipts received by Hyatt and its *"related entities,"* a term which all parties, and especially counsel for Hyatt, understood at the time was broader than but surely included its subsidiaries and affiliates.

On May 16, 1997, the Skopbank Parties filed their motion for contempt, preclusion, and other sanctions for Hyatt's failure to comply with the January 28th Order as extended on February 5, 1997 ["January 28th Order"].[5] On August 15, 1997, the Court took testimony and argument on matters surrounding the computer-based financial records and ordered the parties to again confer. At another hearing on October 15, 1997, Hyatt claimed that missing and unavailable records had impaired its ability to produce the "document" and that the Court had somehow orally reduced the scope of its written order of January 28, 1997, during the telephonic conference on February 5, 1997. Both these excuses were categorically rejected as recapped in a Clarifying Memorandum entered December 19, 1997.

> The Court specifically found that Hyatt's failure to comply with this Court's January 28, 1997, Order requiring it to produce an accounting document (in lieu of an equitable accounting) was sanctionable, if not contumacious (November 14th Tr. at 76-77); its conduct formed an integral part of the overall pattern of delay and obstruction. Hyatt attempted to justify its submission of nothing more than an outline of its cash receipts as complying with an oral modification of the written and published order during a telephone [conference] on February 5, 1997, concerning discovery matters conducted jointly with the Magistrate Judge. A review of the transcript of that telephone call gives no support to Hyatt's make-weight argument. There is no way that Hyatt and its then-counsel could have contended in good faith that this document satisfied this Court's order to produce an accounting for all the benefits Hyatt received while it wrongfully remained in possession of the St. John Hotel during the eighteen months between March 1995 and September 1996.

---

[5] For ease of reference, the Court's written and published Memorandum and Order of January 28, 1997, as extended on February 5, 1997, will sometime be referred to simply as the "January 28th Order."

*GGF v. Hyatt Corp.*, 177 F.R.D. 336, —, Civ. No. 1995-49 M, 1997 WL 793291, at *3 (D.C.V.I. 1997).

This Court earlier had ruled from the bench on November 14, 1997, that the accounting document Hyatt produced came no-where near what the plain reading of the Order required. (Finding dictated from Bench Nov. 14, 1997, Tr. at 77-78.) Hyatt's then newly-engaged counsel implied that, with its new-found under-standing of the January 28th Order, Hyatt would revise its docu-ment to satisfy the Skopbank Parties and this Court. (Nov. 14, 1997, Hearing, Tr. at 90.) Hyatt did submit a revised accounting "docu-ment." The Skopbank Parties reviewed this new version and, on December 23, 1997, renewed their motion for sanctions and preclusion of evidence because the new submission still did not comply with the January 28th Order. Both sides fully briefed the issue and presented testimony and argument at the January 1998 Hearing.

The Court agrees that Hyatt's submission as of the January 1998 Hearing still missed one of the main points of the Order. The revised cash flow document provided no information from which the Court could determine whether and what benefits Hyatt received through payments of hotel funds to Hyatt-related entities, or whether and what legitimate expenses could appropriately be [*12] deducted from the gross income Hyatt reaped as a fiduciary during its wrongful use of 35 Acres' property.

On April 1, 1998, 35 Acres filed its motion for summary judgment on Count VI of the third amended complaint. Count VI includes multiple claims and appears to request damages at law for the same period and may overlap or duplicate the relief in equity sought by the equitable accounting. Hyatt opposed this motion and attached a yet again revised "reconstructed cash flow" for the hotel for the period including the illegal holdover.[6]

---

[6] Hyatt relates in agonizing detail the difficulties in sorting through and compiling these records, for the first time since January 28, 1997, making use of the historical financial records of the hotel stored in the custody of plaintiffs' counsel in the Virgin Islands. Other than complaining about not getting full access to selected copies of some of these records (the infamous "Ciccone documents"), it was not until late 1997 that Hyatt arranged for access to these historical records, which it has asserted since February 1997 were essential to producing the accounting document.

## DISCUSSION

## Hyatt's Contempt for Violation of the January 28th Order

The documents Hyatt introduced at the January 1998 Hearing purported to establish the "Hyatt Regency St. John Cash Flow" from: (1) an opening balance as of March 21, 1995, the date Hyatt began its illegal holdover; (2) a closing balance as of September 16, 1996, the date Hyatt finally vacated; (3) the funds received by the hotel during that period; and (4) the funds Hyatt represented were distributed during that period to Hyatt's corporate office ["Hyatt Corporate"] and to pay hotel vendors and suppliers for expenses incurred by the hotel.[7] [*14]

Unfortunately, Hyatt's revised effort to comply with the Court's Order in January of 1998 still provided no way to determine whether these payments from the hotel funds went to bona fide third-party suppliers and vendors or to Hyatt-related entities, and thus whether and how much Hyatt would be required to disgorge due to its illegal holdover. The amount Hyatt claimed the hotel paid to third-parties was inclusively labeled "Accounts Payable," totaling about $ 10,600,000. (Jan. 15, 1998, Hearing, Tr. at 55-56.) The individual payments were not itemized and the submission thus did not establish whether or not some of these monies were paid to Hyatt-related entities, although there was indication that some payments actually went to other Hyatt hotels. More importantly, the Skopbank Parties produced evidence that hotel funds were used to pay sixteen percent of the services an entity called MT Phone provided to the New York Hyatt offices, even though MT Phone did no business with the St. John Hotel. (*Id.* at 86.) Since MT

---

[7] The category "Other Wire Transfers" was unexplained on the "Hyatt Regency St. John Cash Flow" document submitted. (Jan. 15, 1997, Hearing, Tr. at 40-42.) Hyatt attempted to explain that it was all the money sent from the hotel to Hyatt Corporate. As such, it should have agreed with the document entitled "Revised Cash Receipts, Hyatt Regency St. John," a spreadsheet for the years 1990-96, another document prepared based on Hyatt corporate records. (*Id.* at 44.) Hyatt Corporate documents, however, showed Hyatt received $120,000 more than the hotel records would have the Court believe. (*Id.* at 44-49.) The Skopbank Parties' expert believed that this indicated that monies were received by Hyatt other than by wire transfer, and this Court agrees. (*Id.* at 49.) This finding is supported by the plaintiffs' proffer of evidence of other funds submitted by check to Hyatt Corporate. (*Id.* at 51.)

438

Phone is a Hyatt-related entity,[8] Hyatt's revised accounting submission in January 1998 still violated this Court's January 28th Order by concealing such payments of hotel funds during Hyatt's illegal holdover.

In response to questions from the Court, Hyatt's expert agreed that this revised accounting "document" did not give "any indication of money that the Hyatt organization received over and above expenses[.]" (*Id.* at 123.)

> THE COURT: Well, if there were any funds in here that were not a wash, were not simply their reimbursement for other expenses, but amounted to additional income whether it's called profit or not, but additional income to Hyatt and it's related companies, you couldn't tell from this, could you?
>
> THE WITNESS: No, I think you'd have to do a little more work.
>
> THE COURT: And then — so the Court wouldn't be able [*16] to tell whether or not Hyatt should be required to disgorge gains received from improper use of [the property]?
>
> THE WITNESS: To the extent that we have learned here that there may be an item like MT Phone that is included in something else and if, in fact, there is a profit margin or net, I think that would require a little more work.

(*Id.* at 125-26.)

Counsel for plaintiffs discussed Hyatt-related entities in addition to MT Phone with the expert, and then asked the following questions:

> COUNSEL: Is it not correct that you made an assumption that all of those payments [in the entry for "Accounts

---

[8] MT Phone is an entity created by Hyatt in 1991 to function as a clearing house for all telephone bills. MT Phone also establishes credits at AT&T which are then sold to Hyatt hotels at a profit to MT Phone. MT Phone clearly falls within the definition of a Hyatt-related entity. (Jan. 15, 1998, Hearing, Tr. at 85, 91.)

Payable"] for some 12 million or 10 million dollars from the holdover period were to third parties; is that correct?

WITNESS: I did.

COUNSEL: Are you still willing . . . to tell this Court under oath that that assumption is correct, based on what you know today?

WITNESS: No. . . .

*(Id.* at 128.)

The foregoing makes it crystal clear that, at least as late as January 1998, Hyatt persisted in its obdurate and contumacious refusal to follow the lawful orders of this Court. As of the hearing on January 15, 1998, Hyatt still had not complied [*17] with the Court's Order, issued one year earlier on January 28, 1997, to account for all the funds which passed through its hands during the period it continued illegally to remain in possession and continued to act as manager of the hotel in breach of its fiduciary duties to the hotel's owner. Hyatt's performance at the January 15, 1998, hearing evidenced a carefully planned and orchestrated effort to appear to comply with the Order without disclosing what Hyatt apparently considers highly damaging information about its related entities. This deliberate noncompliance and withholding of properly producible information constitutes contempt of this Court.

Hyatt was not content with mere contempt, however. It affirmatively misrepresented what it had produced to this Court. The charade of Hyatt's own expert at the January 1998 Hearing is particularly enlightening. Although the purpose of the hearing was to determine if Hyatt had provided complete information and documentation in compliance with a court order, Hyatt's expert testified that he had first been shown the order on which Hyatt expected him to give a supportive opinion just days before the hearing. (*Id.* at 112.) Even then, it was not Hyatt's attorneys who had showed the Order to him, but counsel for the Skopbank Parties! Further, the excerpts of his testimony quoted above make it obvious that Hyatt's expert had not been advised of the purpose of the Court's January 28th Order. The Court therefore finds that

this contumacious performance further constitutes a deliberate attempt to mislead and perpetrate a fraud upon this Court.

It is impossible that Hyatt and its counsel could have again "misunderstood" the scope of what the Court had ordered, especially after the Court's specific finding that Hyatt's earlier and totally inadequate effort at compliance was sanctionable, if not contumacious.[9] Hyatt's effrontery in presenting more of the same in a "new" submission with still no itemization of the benefits Hyatt-related entities received during the illegal holdover, and then misleading its testifying expert and, therefore, the Court about the purpose of the submission, is truly mind-boggling. Whether this effrontery stems from desperation to cover up evidence which might support plaintiffs' claims of improper kickbacks to Hyatt-related entities, which evidence it appears has only recently been pried from Hyatt's iron grasp, remains to be developed at trial. It suffices here to observe that this audacious performance falls squarely within the overall pattern of delay and obstruction the Court has already found to have been demonstrated by Hyatt's conduct in this case. *See GGF v. Hyatt Corp.*, 1997 WL 793291, at *4.

**Equitable Accounting**

We now turn to the relief due 35 Acres on its renewed request for an equitable accounting. First off, during the January 1998 Hearing, this Court reminded Hyatt that a ruling that it is liable for this holdover period would not be a sanction, since Hyatt has been found to be liable as a matter of law for its illegal holdover and it has no counterclaims. Secondly, although it would be within this

---

[9] The scope of the January 28th Order and the definition of benefit to Hyatt had been at issue since before its ink was dry. Only a week later, during the telephone conference on February 5th, the scope of the benefits covered was clarified as including all Hyatt-related entities. Hyatt counsel may have protested this broader definition, but there was no suggestion that the term "Hyatt-related entities" was so vague that it would prevent compliance with what the Court had ordered. The issue was discussed several times thereafter, again without Hyatt's counsel indicating that the term was so broad that the required information on Hyatt's affiliates and subsidiaries could not be produced, nor suggesting that its affiliates and subsidiaries would not fall within the meaning of "Hyatt-related entities." The issue was raised again at the January 1998 Hearing, when Hyatt for the first time suggested what it could present to the Court. (Jan. 15, 1998, Hearing, Tr. at 185.)

441

Court's discretion to order as a sanction that Hyatt pay to the 35 Acres all of the gross receipts which flowed through the hotel during the period, as plaintiffs have requested, the Court will not do so, at least not at this time.[10] And finally, the sanctions for Hyatt's contempt of this Court's Order, and its concomitant attempt to defraud the Court, will be determined at or after the trial, as will any sanctions which may be imposed under the Court's inherent authority.[11] Clearly, all such sanctions are separate and apart from the equitable accounting which may be ordered.

---

[10] Though not exercising its discretion to sanction Hyatt and order the disgorgement of all receipts, the Court has carefully considered it in light of the principles expounded upon in *Poulis v. State Farm & Casualty Co.*, 747 F.2d 863 (3d Cir. 1984). The Court has conducted the analysis as follows.

Hyatt's Personal Responsibility: Hyatt is at least as responsible as its chosen counsel, now-withdrawn, in contributing to the sanctionable conduct. Both Hyatt and its counsel have exhibited the same pattern of stonewalling. Further, it was Hyatt which decided to continue on as an illegal holdover and it was Hyatt which decided not to put in place the accounting procedures necessitated by this holdover.

Prejudice to Adversary: Clearly, the Skopbank Parties have been prejudiced. The amount of money and time required in preparation and appearances before this Court to demonstrate Hyatt's non-compliance has been enormous and could have been much better spent in preparing for trial, rather than having to deal with Hyatt's obduracy.

History of Dilatoriness: Of this, there is no question. The document was ordered over a year ago. The docket sheet confirms the many times that the Skopbank parties have had to wrangle with Hyatt over these issues. Indeed, Hyatt, and for sure its prior counsel, have been dilatory and obstructive at almost every stage of this litigation, from not responding to requests, to interposing improper and inadequate objections, and ultimately filing inadequate responses. This failure to produce an accounting document is but indicative of the pattern for which this Court has previously sanctioned Hyatt.

Wilful or in Bad Faith: Clearly, Hyatt's conduct in not complying with the January 28th Order was Wilful and in Bad Faith, if not contumacious.

Other Sanctions: This Court would be at a creative loss to fashion any less sanction which would meet the needs of this litigation.

Meritoriousness: Since Hyatt is legally liable for the holdover period, with no offsetting counterclaims, all the merit is with plaintiffs.

[11] The Court is here concerned with the time and effort it has been forced to waste in trying to understand and determine if Hyatt has complied with the January 28th Order. The possibility that counsel may have assisted Hyatt in its continued refusal to produce what the Court has ordered is very disturbing. The Court's inherent power to discipline any and all who come before it will come into play if this turns out to be the case. The effective functioning of the judicial process is stymied when the Court cannot rely on all counsel and parties appearing before it to make every good faith effort to comply with its lawful and proper orders. If a litigant or its counsel believes some aspect of such an order is unclear, counsel must seek clarification from the Court. At the very least, counsel must advise the client to produce whatever clearly and concededly falls within the ambit of the order. Particularizing it to this case, neither counsel nor Hyatt could refuse to itemize benefits which any admittedly Hyatt-related party, e.g., Hyatt's affiliates and subsidiaries, may have received during the illegal holdover period simply

35 Acres has renewed its motion for an equitable accounting, that is, for a decree that Hyatt disgorge the benefits it received during the approximately eighteen-month period it wrongfully used the hotel. In response to the Court's inquiry at the January 1998 Hearing, plaintiffs' counsel summarized what the January 28th Order required and what 35 Acres is entitled to receive:

> We want . . . a Court finding that they have not complied with the Court's orders of January 28th or February 5th, 1997. We want a preclusionary order precluding Hyatt from presenting any evidence in defense of liability for damages for the holdover period of March 1995 to September 1996. . . . In Your Honor's order last January you were reluctant to require Hyatt to do an equitable accounting. We think that the time has come for that, that they've had so many chances and they have continued to miss them. . . . Here's what I think the practical effect should be. . . . We accept the gross receipts. That's $24 million for the . . . eighteen-month period. . . . We think they should be required to pay to us that amount and the only deductions would be for documented payments to third parties, not any Hyatt-related or Hyatt affiliates, plus interest. Properly documented, legitimate papers. For example, Your Honor, they bought goods from someone, fine. They have an invoice. That's a legitimate deduction. . . .

(Jan. 15, 1998, Hearing, Tr. at 218-20 (Court's questions omitted).)

To reiterate the elements of a cause of action for equitable accounting, the Skopbank Parties have established a prima facie case by showing that:

(1) Hyatt owed plaintiffs a fiduciary duty to properly account for all funds coming into the hotel from March 21, 1995, to

---

because they believe the Court's definition of "Hyatt-related parties" was too broad. Whether or not this is what occurred, and the extent to which counsel may have participated, can be determined only after the affected parties have been given an opportunity to fully brief the issue and be heard, and again, only after the merits of this dispute between the parties have been decided.

September 16, 1996. The Court has held that Hyatt had such a fiduciary duty. *GGF v. Hyatt*, 955 F. Supp. at 466;

(2) Hyatt breached that duty by not turning over any of these funds to the Skopbank Parties. *Id.* Moreover, Hyatt has no set-off against what is due plaintiffs from those receipts since the Court has dismissed or granted summary judgment in favor of plaintiffs on all of Hyatt's counterclaims. *GGF v. Hyatt*, 955 F. Supp. at 463; *GGF v. Hyatt*, 960 F. Supp. at 951; and

(3) Hyatt has admitted that it received approximately $24,000,000 in gross receipts from the Hotel during the eighteen months in question.[12]

Joel Eichengrun, *Remedying the Remedy of Accounting*, 60 IND. L.J. 463, 470 (1985).

On the same assumption that the normal lack of adequate legal remedy does not apply, the Court finds that Hyatt did not carry its burden to establish the appropriateness of the expenses, losses or other deductions it claims should reduce the amount due 35 Acres. Under the same assumption, then, the Court, as the finder of fact in equity, resolves all inferences against Hyatt and presumes that all these unaccounted for funds were misappropriated. This would appear to include its management fees,[13] chain allocations, and what it claimed but had not justified by appropriate evidence as trade payables, including the whole of any amounts Hyatt char-

---

[12] This is the amount accepted by plaintiffs during the November 14, 1997, hearing. (Nov. 14, 1997, Hearing, Tr. at 218-20.) This amount has perhaps been revised upwards by later filings. *See* Corson Decl., Hyatt's Opp'n at Ex. 1, ¶ 17.

Thus, 35 Acres has established a prima facie case for equitable accounting and the burden shifted to Hyatt to prove what deductions from gross receipts are appropriate, assuming, *arguendo*, that 35 Acres is not required to show that it has no adequate remedy at law. Once the plaintiff's burden to prove a prima facie case has been met,

the defendant, in turn, has the burden of proof to establish expenses, losses or other deductions which it is claimed reduce the amount due to the plaintiff. It will be presumed that funds or property unaccounted for were misappropriated, and expenses unexplained were not incurred, with all inferences resolved against the defendant on these issues.

[13] *See Vinlis Constr. Co. v. Roreck*, 27 N.Y.2d 687, 262 N.E.2d 215, 314 N.Y.S.2d 8 (1970) (surcharging in equitable accounting faithless trustee for salary paid him).

acterized as paid to related-entities, since Hyatt did not particularize or justify which portions might be profits or "benefits."[14]

The question arises whether the Court should use as its source of data from which to determine the appropriate expenses, losses or other deductions the state of facts to which the Court should look are the documents and information on file or served on the Skopbank Parties as of the January 1998 Hearing or as of April 23, 1998, the date of the latest hearing. In reviewing the various motions for summary judgment the parties have filed, the Court has become aware of significant refinements in Hyatt's belated but continuing effort to particularize many of these claims under its present counsel since the January 1998 Hearing.[15] It appears that numerous and lengthy documents which may be relevant to a proper accounting have passed between the parties, even if not also filed with the Court. Giving Hyatt a huge and undeserved benefit of the doubt, the Court will look to the documents and information on file or served on the Skopbank Parties as of the April 23, 1998 hearing. To use the earlier date of the January 1998 Hearing would amount to a monetary sanction and such sanctions are not being imposed at this time before trial. Accordingly, when the parties produce their calculations on the amount Hyatt must disgorge for purposes of an equitable accounting, as required below, they may use the date of the hearing on April 23, 1998, as the cut-off date for documents Hyatt has produced. Simple interest at the legal rate of nine percent per annum would seem to be appropriate as of October 1, 1996, and the full amount would be paid out of the supersedeas bond posted in 1995 for just this purpose.

**Summary Judgment on Count VI**

35 Acres argues that it is "entitled to an adjudication of Hyatt's liability for the holdover period because there is no genuine issue of fact" and that "Hyatt should be required to pay to 35 Acres all funds Hyatt received during the holdover period." As already

---

[14] "Upon any accounting, [the agent] does indeed have the burden of proving any credits, if they are challenged . . . ." *Palima v. Fox*, 182 F.2d 895, 900 (2d Cir. 1950).

[15] If the Court were to hold Hyatt to the state of the record on January 15, 1998, it would appear that only the expenses for payroll could be considered sufficiently explained.

noted, Count VI includes multiple claims and appears to be requesting damages at law for the same period and also seems to overlap or duplicate the relief at equity sought by the equitable accounting.

35 Acres bases its claim that it is entitled to an adjudication of Hyatt's liability on section 422 of the Restatement (Second) of Agency,[16] which provides that "unless otherwise agreed, an agent who has charge of land or chattels for his principal is subject to a duty to the principal to . . . surrender them upon demand or upon the termination of the agency." This Court has found that Hyatt was an agent who refused to surrender its charge upon the termination of the agency. *GGF v. Hyatt Corp.*, 34 V.I. 257, 166 F.R.D. 321 (D.V.I.), *aff'd*, 35 V.I. 483, 95 F.3d 291 (3d Cir. 1996).

More important for this discussion, however, is section 382 of the Restatement, which provides that "unless otherwise agreed, an agent is subject to a duty to keep, and render to his principal, an account of money or other things which he has received or paid out on behalf of the principal." Relying on this section, this Court has previously held that an agent, such as Hyatt, must "keep and render accounts to the principal of all financial affairs which the agent has handled on behalf of the principal." *Wilcox v. St. Croix Labor Union Mut. Homes, Inc.*, 567 F. Supp. 924, 935 (D.V.I. 1983).

Summary judgment, of course, applies to causes of action seeking damages at law and is appropriate thereon "if the pleadings . . . together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). Summary judgment may be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). Once the moving party properly supports its motion for summary judgment, the non-moving party must establish a genuine issue of material fact in order to preclude

---

[16]In the absence of specific governing authority in the Virgin Islands, the Restatement provides the applicable rule of law. V.I. CODE ANN. tit. 1, § 4 (1995).

a grant of summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise [*30] properly supported motion for summary judgment . . . ." *Anderson*, 477 U.S. at 247-48. In addition "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

This Court finds that 35 Acres is entitled to partial summary judgment as a matter of law on Hyatt's liability under Court VI for its duty to keep an account of money which Hyatt received or paid out on behalf of its fiduciary, 35 Acres, during the illegal holdover period. Because the recently filed documents demonstrate that there are material disputes of fact over the amounts and damages to which 35 Acres is entitled, however, summary judgment cannot be granted on damages.

## REMEDIES — EQUITABLE OR LEGAL?

At this stage of the proceedings, it appears that 35 Acres is seeking relief from Hyatt during the unlawful holdover period from both the equitable and law sides of the Court. On the one hand, 35 Acres seeks an order under the ancient equitable remedy of restitution through an accounting "to capture profits and force proof from the defendant."[17] On the other hand, it seeks damages at law in Count VI. The dilemma the Court posed to the parties at the hearing on April 23, 1998, which this Memorandum attempts to refine, is whether the two remedies are mutually exclusive or whether an "accounting to capture profits" in equity affords greater (or lesser) recompense than an accounting on the law side or other actions at law for damages. A fundamental question is whether this remedy of an equitable accounting is still viable at all, and if so, whether it is available in the circumstances of this case. *See Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 8 L. Ed. 2d 44, 82 S. Ct.

---

[17]1 Dan B. Dobbs, Law of Remedies § 4.3(5), at 610 (2d ed. 1993). Dobbs delineates three theories for an equitable accounting: (1) "accounting to deal with complex accounts," (2) "accounting as discovery," and (3) "accounting to capture profits and force proof from the defendant." *Id.*

894 (1962). As Justice Black wrote, "the necessary prerequisite to the right to maintain a suit for an equitable accounting, like all other equitable remedies, is . . . the absence of an adequate remedy at law." 369 U.S. 469 at 478 (*citing Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506-10, 3 L. Ed. 2d 988, 79 S. Ct. 948 (1959)). Of course, whether the scope of the respective remedies is equivalent may affect the determination of the availability of an adequate remedy at law. Finally, does the comment by Justice Black toward the end of *Dairy Queen*, that "the legal claims involved in the action must be determined prior to any final court determination of respondent's equitable claims," apply to this case, and if so, how does it apply here? 369 U.S. at 479.

There is support for the proposition that an "equitable accounting" is purely equitable, in that it is not an action for damages to compensate for something of which 35 Acres was deprived, but an action in equity to capture profits from the defendant, which would otherwise unjustly enrich a wrongdoer. An equitable accounting has "root[s] in historical distinctions between actions at law and equity, that an action seeking an 'accounting for profits,' as distinct from an action seeking an 'accounting for damages,' is purely equitable and therefore carries no right to a jury trial." *American Cyanamid Co. v. Sterling Drug Co.*, 649 F. Supp. 784, 786 (D.N.J. 1986).[18]

There is also support in the Restatement that the remedy for a breach of an agent's duty to keep and render an account of money received or paid out on behalf of the principal under section 382 of The Restatement (Second) of Agency may be either an accounting at law or an accounting in equity to capture profits. The comment in section 382 on remedies of the principal provides that "if the agent has failed to account properly, the principal's remedy may be by an action on the contract, by an action for money had and received, or by a bill for an accounting," and refers to section 399.

---

[18] *See First Commodity Traders, Inc. v. Heinold Commodities, Inc.*, 766 F.2d 1007, 1011 (7th Cir. 1985). The court there denied an equitable accounting because a monthly account had been stated and petitioner had acquiesced to its correctness. Just the opposite is presented here, since Hyatt has refused to produce any proper or acceptable accounting. *See also Palazzo v. Palazzo*, 121 A.D.2d 261, 503 N.Y.S.2d 381, 384 (N.Y. App. Div. 1986) (granting equitable accounting to disgorge profits for withholding information).

RESTATEMENT OF AGENCY (SECOND) § 382 cmt. e. Section 399 pertinently provides that a

> principal whose agent has violated or threatens to violate his duties has an appropriate remedy for such violation. Such remedy may be:
>
> (a) an action on the contract of service;
>
> (b) an action for losses and for the misuse of property;
>
> . . .
>
> (d) an action for restitution, either at law or in equity;
>
> (e) an action for an accounting . . . .

*Id.* § 399.

The mere recitation of the remedies available to a principal such as 35 Acres, as well as the comments to section 399, indicate that some may be in equity and others in law. The remedies in 399(a) or (b) would most likely be for damages at law. An action for restitution under 399 (d) is expressly either at law or in equity. The comment on clause (d) refers to the rules in the Restatement of Restitution, including, specifically, those in section 133 where the agent acquired property which should have gone to the principal, in section 160 that the assets of the agent may be subject to a constructive trust, in section 197 where a fiduciary wrongfully receives or retains a bonus or commission or other profit, and in sections 150-59 for the measure of recovery. RESTATEMENT (SECOND) OF AGENCY § 399 cmt. d.

While the comment on clause (e) of section 399 is pertinent, it mainly highlights the problem of reconciling the remedies in equity with those at law, without providing much guidance.

> A principal does not have an action for an account or other equitable relief against an agent merely because of the existence of the agency relation or because the agent has received something for or from the principal. However, equitable relief may be granted not only when there is no adequate remedy at law, as where an injunction is granted, but also where there is a close fiduciary relation.

449

If the agent is not only an agent, but also a trustee, as where he is given money to invest for the principal which he invested in his own name, an action for an accounting will ordinarily lie. On the other hand, unless there is such a complication of accounts that it is difficult for the machinery of the law courts to cope with them, the principal ordinarily cannot bring an action in equity for money due; if his remedy otherwise would be solely in the courts of law, he cannot bring an action for an account merely on the ground of the agency relation. It is not within the scope of the Restatement of this Subject to state generally the circumstances under which an action for an account will lie.

*Id.* § 399 cmt. e (emphasis added). In a sense, section 382 either leads in a circle or takes us to a fork in the road with no suggestion which prong to follow.

Although the 1937 Restatement of Restitution appears to shed light on the duties owed by an agent to a principal and the remedies for the breach of those duties, it must be kept in mind that it preceded *Beacon Theatres and Dairy Queen* by some twenty years. It may nevertheless be helpful, since the 1957 Second Restatement of Agency refers back the Restatement of Restitution. For example, section 138 provides that a "fiduciary who has acquired a benefit by a breach of his duty as fiduciary is under a duty of restitution to the beneficiary." RESTATEMENT OF RESTITUTION § 138(1) (1937). More specifically, section 197 provides that "where a fiduciary in violation of his duty to the beneficiary receives or retains a bonus or commission or other profit, he holds what he receives upon a constructive trust for the beneficiary." *Id.* § 197.

A constructive trust, of course, is traditionally a remedy in equity. For example, section 160 provides that "where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it, a constructive trust arises." *Id.* § 160. The last paragraph of comment e to that section states that, even if the constructive trust is for money, the payor "is entitled to maintain a proceeding in equity for specific restitution if the

450

payment or transfer was procured by an abuse of a fiduciary or confidential relationship." *Id.* cmt. e. It may be instructive that the Third Circuit Court of Appeals has allowed just such equitable relief since *Dairy Queen. See Voest-Alpine Trading USA Corp. v. Vantage Steel Corp.*, 919 F.2d 206, 215-18 (3d Cir. 1990) (upholding imposition of constructive trust for fraudulent conveyance to prevent unjust enrichment). Comment c to section 160 further states that this constructive trust is appropriate even though the benefit to the fiduciary is not at the expense of the beneficiary and is imposed in an effort to prevent conflicts of interest. RESTATEMENT OF RESTITUTION § 160 cmt. e.

The Ninth Circuit Court of Appeals dealt with the scope of summary judgment based on Restatement of Restitution section 197 in *FSLIC v. Molinaro*, 889 F.2d 899, 904-05 (9th Cir. 1989), *cited by Seidman v. Office of Thrift Supervision*, 37 F.3d 911, 935 (3d Cir. 1994). A savings and loan director was found to have breached his fiduciary duty and was required by the district court to disgorge his consideration for doing so, citing section 197. The court of appeals held that summary judgment on liability was properly granted, but that Molinaro should only disgorge his profits gained from the breach, not the total value of the loans procured in violation of his duty. As such, material facts were in dispute and the summary judgment on the amount of money owed to the FSLIC was reversed.

## CONCLUSION

As directed at the hearing on April 23, the parties will file simultaneous briefs presenting their respective arguments and authorities for the Court to be able to decide whether an "accounting to capture profits" at equity affords greater (or lesser) recompense than an accounting on the law side or other action at law for damages; whether the two remedies are mutually exclusive; whether the remedy of an equitable accounting is still viable at all, and if so, whether it is available in the circumstances of this case; the effect of the scope of the respective remedies on the availability of an adequate remedy at law; whether all legal claims involved in this action must be determined before any final court determina-

tion of plaintiff's equitable claims; and any other points of authority or argument which might assist the Court.

So the Court will have all the information to make a full determination, the parties shall further assume that the equitable accounting herein described is available as a remedy to 35 Acres and shall calculate the measure of recompense to be disgorged using the documents on file as of April 23, 1998. An appropriate Order is attached.

ENTERED this 4th day of May, 1998.

### ORDER

For the reasons set forth in the foregoing Memorandum, this Court hereby

HOLDS the defendant, Hyatt Corporation, in contempt of court for wilfully and contumaciously failing and refusing to comply with this Court's Order of January 28, 1997, as extended on February 5, 1997, requiring Hyatt to produce an accounting document; sanctions for the contempt of this Court's Order, and any concomitant conduct, will be determined at or after the trial; it is further

DECREED that 35 Acres has met its burden of proof and is entitled to an equitable accounting, as described in the accompanying Memorandum, if this remedy in equity is available and appropriate in the context of this case.

The Court having found that material facts are in dispute regarding damages on plaintiffs' motion for summary judgment on Court VI, it is hereby

ORDERED that the plaintiffs' motion for summary judgment on Count VI is GRANTED on liability and DENIED on damages.

The Court having requested the assistance of the parties on the availability of a remedy in equity, as opposed to relief at law, it is hereby

ORDERED that the parties file simultaneous briefs on the questions posed in the "CONCLUSION" to the accompanying Memorandum no later than noon on Monday, May 11, 1998. The parties shall further assume that the equitable accounting herein described is available as a remedy to 35 Acres and shall calculate

the measure of recompense to be disgorged using the documents on file as of April 23, 1998.

ENTERED this 4th day of May, 1998.